LOUIS KADISON, JULIUS I. KISLAK, AND ISAAC GROSS, EXECUTORS UNDER THE LAST WILL AND TESTAMENT OF ISRAEL KORETZKY, DECEASED, PLAINTIFFS, v. LILLIAN HORTON, MYER B. HORTON, JEANETTE POLLAK, JACOB KORETZKY, AND BRIGHT STAR WAREHOUSE CO., DEFENDANTS.

JACK M. KORETZKY, SOMETIMES KNOWN AS JACOB KORETZKY, PLAINTIFF, v. JULIUS I. KISLAK, ISAAC GROSS AND LOUIS KADISON, DEFENDANTS.

Superior Court of New Jersey
Chancery Division

Decided December 21, 1950.

See also 142 *N. J. Eq.* 223, 59 *A.* 2d 587.

*Messrs. Gross & Gross* and *Messrs. Milton, McNulty & Augelli,* attorneys for executors of the estate of Israel Koretzky.

*Messrs. Bilder, Bilder & Kaufman,* attorneys for Jacob Koretzky, et al.

*Messrs. Riker, Emery & Danzig,* attorneys for Jeanette Pollak.

*Messrs. Platoff & Platoff,* attorneys for Julius I. Kislak.

*Messrs. Carpenter, Gilmour & Dwyer,* attorneys for Louis Kadison.

GRIMSHAW, J. S. C. There are two complaints involved in this litigation. In one, the executors of the estate of Israel Koretzky, deceased, seek the cancellation of four certificates of stock of the Bright Star Warehouse Company issued after his death in the names of Koretzky's children. In the other, Jacob Koretzky, son of the decedent, seeks the removal of the executors, and a restraint against their qualification as trustees under the will. In this latter suit the court is also asked to void a consent to the payment of $25,000 by the Bright Star Battery Company to Abraham I. Barash, hus-

band of one of the beneficiaries under Israel Koretzky's will, which consent was signed by all of the beneficiaries.

The cases were tried together. The hearings extended over several months and were conducted in an atmosphere of extreme bitterness on both sides. It was difficult to arrive at the truth. The principal witnesses on both sides were repeatedly guilty of misstatements and contradictory statements. However, from the mass of evidence I am satisfied that the following facts have been established.

After a very humble beginning, the decedent, Israel Koretzky, succeeded in building up a very successful business for the manufacture of batteries, flashlights and other kindred articles. To carry on the business, Koretzky formed a corporation known as the Bright Star Battery Company. Of a total stock issue of 39,000 shares of this corporation, the decedent, at the time of his death, owned 30,600 shares. The buildings in which the business was housed were owned by a corporation known as the Bright Star Warehouse Company, of which corporation Koretzky owned the entire stock issue of ten shares.

Koretzky died in Florida, of a heart attack, on January 7, 1946. He left surviving his daughters, Anne Barash, wife of Abraham I. Barash, Lillian Horton, wife of Myer B. Horton, Jeanette Pollak, wife of Theodore Pollak, and one son, Jacob Koretzky.

Abraham I. Barash had been associated in business with the decedent for a number of years. During Koretzky's lifetime Barash served as secretary-treasurer of the Battery Company. Some time after Koretzky's death Barash became president of the company, a position which he still holds. Horton joined the Battery Company in 1940. He was elected vice-president, a position which he continued to hold until his discharge in May, 1947. Pollak worked for a number of years as head of one of the departments of the company. He, too, was discharged in May of 1947, as was Jacob Koretzky. Both Barash and Horton, together with Israel Koretzky, served as officers of the Bright Star Warehouse Company.

Israel Koretzky's will, executed in 1941, was probated on February 6, 1946. In it he named as executors and trustees, Julius I. Kislak, a prominent real estate operator, Louis Kadison, the company accountant, and Isaac Gross, the company lawyer, who had been Koretzky's solicitor for a number of years. Among other things, the will provided as follows:

"2. All the rest residue and remainder of my estate, real, personal and mixed, and wherever the same may be situated, I do hereby devise, give and bequeath unto my friends Isaac Gross, Julius I. Kislak and Louis Kadison, to have and to hold the same, however, in trust upon the following trusts, terms and conditions:

"(a) All cash on hand or in banks, as well as moneys owing to me by Bright Star Battery Company, Bright Star Warehouse Company and also moneys owing to me by any other person, firm or corporation, whether evidenced by promissory note or other writing, as well as any stocks, bonds or securities issued by any other than Bright Star Battery Company or Bright Star Warehouse Company, as well as the proceeds of any policy or policies of life insurance on my life, which may at the time of my decease be payable to my estate, and all income, interest, dividends and accumulations on any of the items in this subdivision mentioned, shall be held in trust for my beloved son, Jacob Koretzky, but nevertheless, subject to the provisions hereinafter set forth.

"(b) Of my stockholdings in Bright Star Battery Company, a New Jersey corporation, my said trustees shall hold twenty thousand (20,000) shares, together with all dividends and income therefrom, for the benefit of my said son Jacob Koretzky, but also subject to the provisions hereinafter set forth.

"(c) Of my stockholdings in Bright Star Warehouse Company, a New Jersey corporation, my said trustees shall hold six (6) shares, together with all dividends and income therefrom, for the benefit of my said son Jacob Koretzky, but also subject to the provisions hereinafter set forth.

"(d) My said trustees are hereby vested with absolute discretion in their sole and exclusive judgment to apply and pay over such part of the accumulations, income, interest or dividends or capital for the benefit of my said son Jacob Koretzky, as to them may seem necessary or proper, for his maintenance, support or education, or for the support, maintenance or education of his wife and child or children, should he have any, until my said son shall become of the age of forty (40) years; whereupon my said trustees may turn over to him, my said son, all of the trust fund hereby provided for him, with all accumulations thereon. Should my son die before attaining the age of forty (40) years, leaving him surviving a child or children, then I direct my trustees to hold all of the then remaining portion of my estate, so provided for the benefit of my son, for the like benefit

of such child or children of my said son, who shall survive him, in equal shares, to be delivered with all accumulations thereon, when the youngest of my said son's children shall have attained the age of twenty-one years; but until the time for such ultimate distribution shall arrive, to provide such reasonable support, maintenance and education of my son's child or children, out of the same as in the discretion of my trustees shall seem proper.

"(e) That of the remaining of my stockholdings in the Bright Star Battery Company and Bright Star Warehouse Company, both New Jersey corporations, whether standing in my name or in the name of another, but in which I own the equitable interest, I do give and bequeath unto my daughters, Anne Barash, Lillian Horton and Jeanette Pollak, in equal shares. My said trustees shall hold the shares bequeathed to my said daughters under this subdivision, with all accumulations and dividends thereon, and from time to time apply the income or dividends therefrom toward the support and maintenance or my said daughters, each out of her respective share, and shall turn over to each of my daughters the share to which she is entitled, together with any accumulations accrued thereon, upon her attaining the age of forty (40) years. Should any of my daughters die before having attained the age of forty (40) years, leaving her surviving a child or children, then I direct my trustees to hold all of the then remaining portion of my estate, as provided for the benefit of my said daughters respectively, for the like benefit of such child or children of said respective daughters, who shall survive her, in equal shares, to be delivered with all accumulations thereon, when the youngest child of such daughter shall have attained the age of twenty-one (21) years, but until the time for such ultimate distribution shall arrive, to provide such reasonable support, maintenance and education of the child or children of such daughter, out of the same, as in the discretion of my trustees shall seem proper."

There is no doubt that before he died Koretzky had determined to make changes in his will. These changes he discussed with his attorney, Gross, and also with his son Jacob. Among other things, he had decided to remove Kislak and Kadison as executors. However, he died before these changes had been accomplished.

### THE WAREHOUSE STOCK.

Originally the 10 shares of stock of the Warehouse Company were issued to Israel Koretzky, Abraham I. Barash and Dougal Herr. Koretzky had 5 shares, Barash 4 shares and Herr 1 share. The shares of Barash and Herr were subse-

quently endorsed over to Koretzky. These 5 shares were turned in to the company and a new certificate for 5 shares was issued to Koretzky so that at the time of his death all of the stock of the Warehouse Company was in the name of Israel Koretzky.

During the war, young Koretzky served in the Air Corps. In May, 1944, the bomber to which he was attached crashed in Wyoming. Of a crew of eleven, seven were killed. Jacob Koretzky was one of those who escaped, but his injuries were sufficiently severe to keep him in the hospital for a number of months. Upon hearing of the disaster the elder Koretzky rushed out to Wyoming and when there summoned his daughters. They all responded and joined their father. Upon their arrival at Casper the daughters found their father in a very happy and expansive mood. He had learned that day that his son would recover. An impromptu party ensued, during the course of which Koretzky told his daughters Lillian and Jeanette that he was determined to leave control of the battery business to Jacob, but was going to devise the "buildings" to his four children equally. During the ensuing months Koretzky repeated this statement to various people. But, again, he died before he had carried out this intention.

In January, 1946, about two weeks after the death of Israel Koretzky, Horton and Barash had a meeting. The stock certificate book of the Warehouse Company and the certificates for 10 shares, registered in the name of Israel Koretzky, were removed from the office safe where they had reposed for a number of years. The certificates for 10 shares in Koretzky's name, which had not been endorsed by him, were marked "cancelled" and a new certificate for 6 shares was issued to each of the four children, Anne Barash, Lillian Horton, Jeanette Pollak and Jacob Koretzky. The four certificates are all dated July 24, 1943, although the evidence is undisputed that they were actually issued in January, 1946.

After the probate of the will, the executors investigated the circumstances surrounding the transfer of the stock. Demands for the return of the stock certificates were made upon

the children. The demands were refused and ultimately the action for the return of the stock was filed.

Oddly enough, the executors during the course of the trial sought valiantly to convey the impression that Barash was an unwilling participant in the stock transfer scheme. The record does not support the contention. Both Barash and Horton were aware of the declarations of the elder Koretzky concerning his intention to divide the warehouse stock equally among his four children. They were determined that that intention should be carried out and the transfer of the stock was made with that end in view. Fearful that the death of Koretzky would frustrate their plans, they invented the story of a directors' meeting in 1943 at which Koretzky ordered the transfer. They back-dated the certificates to support that story. Barash was a willing participant in the transaction. His change of heart came after suit was started.

The transfer of the warehouse stock cannot stand. While it may be conceded that Israel Koretzky intended to divide the stock equally among his children, he died before he had given effect to that intention. I am satisfied that he never surrendered dominion over or control of the warehouse stock. Possession of that stock was essential to the control of the Warehouse Company. And in that company Koretzky was the dominant figure until his death.

Even if we give full credence to the story of Horton as told at the trial, that Koretzky gave him the warehouse stock with instructions to divide it among the children if anything happened to him, we can only conclude that Koretzky attempted to make a testamentary disposition without the formalities attendant upon the execution of a will. Nowhere in Horton's testimony is there any suggestion that the stock would not have been returned had Koretzky demanded it.

The transfer of the Warehouse stock will be set aside. *Heyer v. Sullivan,* 88 *N. J. Eq.* 165 *(Ch.* 1917); affirmed, 88 *N. J. Eq.* 595 *(E. & A.* 1917); *Swayze v. Huntington,* 82 *N. J. Eq.* 127 *(Ch.* 1913); affirmed, 83 *N. J. Eq.* 335 *(E. & A.* 1914).

At this point it is only fair to point out that while the executors, in their complaint, charged the children of Israel Koretzky with fraud in connection with the issuance of the disputed certificates of stock of the Warehouse Company, the record fails to support any such contention. In fact, during the trial the executors conceded that none of the Koretzky children had had any part in the issuance of the stock and that charges of fraud on their part were without foundation.

## THE BARASH PAYMENT.

During the summer of 1945 the Battery Company suffered a disastrous fire. The insurance payments ultimately received totaled about $670,000. According to the story told by Barash, Israel Koretzky called him into his cottage while the fire was still burning, and told him that for several years he, Koretzky, had been desirous of making some return to Barash for the many years of faithful service which Barash had rendered. The insurance money, he said, would provide the opportunity for Koretzky to realize his desire. Accordingly, he told Barash that after the fire adjustment Barash would receive a present of $25,000. Gross, Kadison and an insurance adjuster named Holland, testified that Koretzky had expressed to them his desire to reward Barash with a gift of $25,000. They all testified that the basis for Koretzky's determination to make the gift was the service rendered by Barash in connection with the adjustment of the fire loss. Prior services were not mentioned.

In any event, at a meeting held shortly after Israel Koretzky's death, at which Gross, Kadison, Horton, Jacob Koretzky and Barash were present, Barash broached the subject of the $25,000 gift. At that time both Gross and Kadison recalled that Israel Koretzky had expressed his intention to make such a gift. Gross testified that young Koretzky also remembered statements by his father to that effect. This, Koretzky denies. Be that as it may, Gross drew a paper by the terms of which the children as beneficiaries under the Koretzky will, approved

of an arrangement whereby the account of Israel Koretzky with the Bright Star Battery Company was to be charged with a payment of $25,000 which would be credited to the account of Abraham I. Barash. All of the children signed the consent and Barash, on January 31, 1946, about a week before the will was probated, drew and cashed a Battery Company check to his order for $25,000.

Thereafter Kadison caused entries to be made in the books of the Battery Company, charging $25,000 to the account of Koretzky and crediting a like amount to the account of Barash. The entries, although actually made in January, 1946, were entered in the books as of November, 1945. Kadison testified that this was done because the books had not been written up for November. He stated that Koretzky had authorized the transaction at a conference he had with Kadison in the company offices in November. Since, however, Koretzky had left for Florida in October, it is difficult to understand how this conference could have taken place. In all of this there is a suggestion of irregularity which is not satisfactorily explained.

At the trial the executors first sought to defend the Barash payment upon the ground that it was a completed gift. When that theory became untenable, they fell back upon the consent signed by the beneficiaries. That consent, Jacob Koretzky, the plaintiff in the second suit, seeks to have voided.

As has been said, the consent to the payment of the $25,000 to Barash was dictated by Isaac Gross. He had been the confidential legal adviser of Israel Koretzky for many years. He was one of the executors and counsel for the estate. It was only natural for young Koretzky to look to Gross for advice. Yet when Barash asked for the $25,000, that advice was not forthcoming. Gross did not tell Jacob Koretzky that the gift to Barash was probably unenforceable. He did not point out that in all likelihood the burden of the $25,000 payment would fall upon Jacob Koretzky. All Gross did was to dictate the consent and have it signed by young Koretzky. In his ignorance, Jacob Koretzky signed the consent. After receiving independent legal advice he repudiated the consent.

In my opinion, that repudiation should stand. *McAllister v. McAllister*, 120 *N. J. Eq.* 407 (*Ch.* 1936); affirmed, 121 *N. J. Eq.* 264 (*E. & A.* 1936).

### THE REMOVAL PROCEEDING.

The prayer for the removal of the executors and for a restraint against their qualification as trustees is based upon two grounds. The executors are charged with improper conduct in the administration of their office. And it is also alleged that they have caused such an atmosphere of distrust, hostility and lack of confidence to arise between themselves and Jacob Koretzky that a proper administration by them of the trust is no longer possible.

That hostility and lack of confidence may exist between the executors as such, and Jacob Koretzky, is not a compelling reason for their removal. The duty of the executors is to collect the assets, pay the taxes, debts and legacies and turn the residue over to the trustees for administration. Bad feeling between the executors and the beneficiaries, however deplorable, need not hamper the efficient administration of the estate.

The first charge is that the executors have failed to proceed promptly with the execution of their duties. The executors retort, with some force, that they could have progressed more rapidly if they had not been required to spend so much time trying to obtain the warehouse stock. With that stock in their possession, the executors can proceed promptly with the liquidation of the tax liabilities and the completion of their duties.

The payment of $25,000 to Abraham Barash has already been discussed. The claim of the Battery Company against the estate for reimbursement has not been approved for payment by the executors, and, under the circumstances, it is not likely that the claim will be approved.

It is also charged that Gross and Kadison used their position as executors to secure extra compensation for themselves

from the Battery Company. For some years prior to Koretzky's death, the firm of Gross & Gross had acted as attorneys for the Bright Star Battery Company. For their services they received an annual retainer of $2,400 and a bonus each year of $1,500. After Koretzky's death the board of directors of the Battery Company, of which both Gross and Kadison were members, set the Gross retainer at the sum of $3,900 and discontinued the bonus. At the same time Kadison's compensation was increased $4,000.

As the holders of a controlling interest in the Battery Company, Gross and Kadison were in a position to dominate the board, and their action in permitting the increased compensation to be voted was very indiscreet and surprising in view of their experience. But there is nothing in the record from which a conclusion can be drawn that the increased compensation was not earned.

 I am of the opinion that the charges of misconduct levelled against the executors are not of sufficient gravity to justify their removal. No useful purpose would be served by such a course and the estate would be saddled with extra expense without corresponding benefit.

There remains for consideration the relationship presently existing between the executors and Jacob Koretzky and its effect upon their availability for services as trustees. That a state of utter discord exists is apparent from the most casual reading of the record. From the very outset, the executors have displayed toward young Koretzky a hostility surprising in its intensity. They have made no attempt to conceal their contempt for him and have rigidly suppressed any attempt on his part to assert himself.

Shortly after his father's death, Jacob Koretzky had been elected a director and secretary of the Battery Company. Within a month after the executors qualified, he was removed. He was retained in the employ of the company for a year at an increased salary and was then discharged. Following his discharge, he was barred from entering the company property. He presented to the executors for payment a promissory note

for $5,000, signed by his father which represented Jacob's share of his mother's estate. Payment was refused by the executors and he was directed to file a claim. This action contrasted sharply with the informality attendant upon the payment of $25,000 to Barash. And all of this time his retention of the certificate of warehouse stock, like that of his sisters, was being characterized as fraud and the receiving of stolen goods.

The executors say that Jacob Koretzky is too young and incompetent to serve as an officer and director of the Battery Company. No particulars are given. The executors ignore the fact that the appointment was the expressed wish of the testator. And they overlook the further fact that their power to discipline the young man springs solely from their control of stock of which he is the beneficiary. Jacob was discharged because he refused to return the warehouse stock. In doing so he acted under the advice of counsel who maintained and still argue that he is entitled to it. No reason is given for the refusal to pay the note or to grant to Koretzky right of access to the plant.

As a result, there has been built up on both sides a state of complete antagonism. The parties cannot speak civilly to one another. A reconciliation is without the bounds of possibility.

The main asset in the *corpus* of the trust estate set up by the testator for the benefit of Jacob Koretzky is a controlling interest in the Bright Star Battery Company. The *corpus,* and with it the control of the business, is to be turned over to Jacob Koretzky when he reaches the age of 40 years. He is now about 25 years old. During the intervening years the trustees are to pay over to Jacob Koretzky such sums as they deem necessary for the support and maintenance of himself and his family.

Implicit in the provisions of the will establishing the trust estate is the testator's expectation and intention that his son should be given an opportunity to gain knowledge and experience in the business before he is called upon to assume

the responsibilities of management. The obligation to provide for and direct this training is placed upon the shoulders of the trustees. Their relationship with the young man is required to be almost that of guardian and ward. To be successful, such a relationship demands a high degree of mutual confidence and respect.

██ I am of the opinion that an administration of the trust in accordance with the desires of the testator would be impossible of accomplishment by the present executors as trustees. Accordingly, I will restrain their qualification and, at the appropriate time, will appoint a substituted trustee. *May v. May,* 167 *U. S.* 310 (1897); *Braman v. Central Hanover Bank & Trust Co.,* 138 *N. J. Eq.* 165 (*Ch.* 1946).